IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARL FRAMPTON, | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| INTERSTATE MANAGEMENT | : | NO. 19-4317 |
| COMPANY, LLC, | | |
| Defendant. | : | |

## MEMORANDUM OPINION

This personal injury action arises out of an incident that occurred on August 5, 2019 at

the Renaissance Philadelphia Airport Hotel ("Hotel") in which Plaintiff Carl Frampton

("Frampton") contends that an unsteady, unattached, and/or unsecured decorative column in the

lobby of the Hotel fell over and struck Frampton's hand.[1]  Pl.'s Br. (Doc. No. 32) at 2.

Defendant Interstate Management Company ("Interstate") has filed a Motion for Partial

Summary Judgment seeking dismissal of Frampton's demand for economic damages in the

amount of approximately $1,200,000.00 on the grounds that the promotion and sponsorship

agreements giving rise to these alleged damages preclude Frampton's recovery.  Def.'s Br. (Doc.

No. 31) at 3-4.  For the reasons set forth below, this Court finds that no genuine issues of

material fact exist and consequently, Interstate's Motion for Partial Summary Judgment will be

granted.

---

[1]    In accordance with 28 U.S.C. § 636(c), the parties voluntarily consented to have the
undersigned United States Magistrate Judge conduct proceedings in this case, including the entry
of final judgment.  See Doc. Nos. 8, 9.

## I.     __FACTUAL BACKGROUND__[2]

In the summer of 2019, Frampton, a three-time world champion super bantam and featherweight professional boxer, traveled from his home in Northern Ireland to Philadelphia, Pennsylvania to participate in a non-title boxing bout that was scheduled for August 10, 2019. Def.'s Br. at 2; Pl.'s Br. at 2.  During his trip to Philadelphia, Frampton was a registered guest at the Hotel.  Id.  On August 5, 2019, at approximately 11:30 a.m., a decorative column in the lobby of the Hotel fell and struck Frampton's left hand, resulting in a fractured fifth metacarpal that prevented Frampton from participating in an August 10, 2019 fight.[3]  Id.

As a consequence of this injury, Frampton claims that, pursuant to the terms of his promotion and sponsorship agreements, he incurred approximately $1,200,000.00 in economic damages.  Def.'s Br., Ex. F at ¶ 3.  Specifically, Frampton argues that he incurred a $1,000,000.00 loss of purse under his Multi-Fight Agreement with Top Rank, Inc. ("Top Rank"),[4] and $200,000.00 in lost endorsements under his three sponsorship agreements: (1) the

---

[2]    Each party has included their statement of facts in the body of their briefs, rather than as a separate document.  Citations to the parties' briefs will be to the page numbers generated by the Court's Electronic Case Filing System.

[3]    Frampton contends that Interstate, as the entity that maintained and controlled the lobby, is liable for his injuries and his alleged economic damages.  Pl.'s Br. at 2.  Interstate challenges this contention, arguing that Frampton's "trainer, James Moore, admittedly walked through a curtain partition that separated the Hotel lobby in which [Frampton] was seated from an adjacent hallway and allegedly caused a freestanding decorative column to fall and strike [Frampton's] left hand."  Def.'s Br. at 2.

[4]    Interstate and Frampton attach the Multi-Fight Agreement as an exhibit to their briefs.  See Def.'s Br., Ex. E; Pl.'s Br., Ex. C.  Citations to the Multi-Fight Agreement will be indicated by "Multi-Fight Agreement" followed by the page number listed in the page footer of both exhibits.

Everlast Sportsperson Sponsorship Agreement;[5] (2) the Kindred Sponsorship/Ambassador Agreement;[6] and (3) the 11 Degrees Ambassador Agreement.[7]  Pl.'s Br. at 2-4.  Interstate, however, contends that the clear and unambiguous terms of the promotion and sponsorship agreements preclude Frampton's recovery of his alleged economic damages.  Def.'s Br. at 3-4.

## II.    **SUMMARY JUDGMENT STANDARD**

Under the well-established summary judgment standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Williams v. Wells Fargo Bank, No. 14-2345, 2015 WL 1573745, at *3 (E.D. Pa. Apr. 9, 2015) (quoting Wright v. Corning, 679 F.3d 101, 105 (3d Cir. 2012)).

> [T]he plain language of Rule 56[a] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue

---

[5]    Interstate and Frampton attach the Everlast Sportsperson Sponsorship Agreement as an exhibit to their briefs.  See Def.'s Br., Ex. H; Pl's Br., Ex. D.  Citations to the Everlast Sportsperson Sponsorship Agreement will be indicated by "Everlast Agreement" followed by the page number listed in the page footer of both exhibits.

[6]    Interstate and Frampton attach the Kindred Sponsorship/Ambassador Agreement as an exhibit to their briefs.  See Def.'s Br., Ex. I; Pl's Br., Ex. E.  Citations to the Kindred Sponsorship/Ambassador Agreement will be indicated by "Kindred Agreement" followed by the page number listed in the page footer of both exhibits.

[7]    Interstate and Frampton attach the 11 Degrees Ambassador Agreement as an exhibit to their briefs.  See Def.'s Br., Ex. J; Pl's Br., Ex. F.  Citations to the 11 Degrees Ambassador Agreement will be indicated by "11 Degrees Agreement" followed by the page number listed in the page footer of both exhibits.

as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his or] her case with respect to which [he or] she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"By its very terms, this standard [that there be no genuine issue as to any material fact] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).  A material fact is one that "might affect the outcome of the suit under the governing law."  Id. at 248.

When ruling on a motion for summary judgment, the court shall consider facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006).  To prevail on summary judgment, however, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-moving party].'"  Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013) (quoting Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)); see also Anderson, 477 U.S. at 252.

## III.   DISCUSSION

### A.   The Multi-Fight Agreement

Frampton demands $1,000,000.00 loss of purse damages for the cancelled August 10, 2019 bout because the Multi-Fight Agreement allegedly guaranteed that he would receive $1,000,000.00 per bout for three bouts in a 15-month time period.  Pl.'s Br. at 5-7.  Interstate

argues that the clear and unambiguous language of the Multi-Fight Agreement precludes Frampton's recovery of the $1,000,000.00 loss of purse.  Def.'s Br. at 4-6, 12.  In support of this contention, Interstate alleges that the Multi-Fight Agreement entitled Frampton to a single payment of $1,000,000.00 in exchange for his participation in a single first bout.  Id.  Interstate further maintains that, because Frampton admittedly received $1,000,000.00 for his participation in the November 30, 2019 bout, he cannot recover a duplicative payment of $1,000,000.00 for the cancelled August 10, 2019 bout.  Id.  Viewing the evidence in a light most favorable to Frampton, this Court finds that the Multi-Fight Agreement is unambiguous and that it precludes Frampton's recovery of $1,000,000.00 loss of purse for the cancelled August 10, 2019 bout.

Interstate contends that New York law governs the Multi-Fight Agreement.  Def.'s Reply at 3-4.  "A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state."  Kruzits v. Okuma Mach. Tool, Inc., 40 F.3d 52, 55 (3d Cir. 1994) (citing Klaxon Co. v. Stentor Elec. Mgf. Co., 313 U.S. 487, 497 (1941); Am. Air. Filter Co. v. McNichol, 527 F.2d 1297, 1299 n.4 (3d Cir. 1975)).  Subject matter jurisdiction in this case is based on the diversity statute, 28 U.S.C. § 1332(a), and thus, Pennsylvania choice of law rules apply.  Kruzits, 40 F.3d at 55.  Because "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them," Bookard v. Estee Lauder Cos., Inc., 443 F. Supp. 3d 561, 569 (E.D. Pa. 2020) (quoting Kruzits, 40 F.3d at 35), this Court's analysis begins with the Multi-Fight Agreement's choice of law clause, which states: "this Agreement shall be governed by, and construed in accordance with the substantive law of contracts of the State of New York, with respect to contracts made and to be fully performed in New York, without regard to New York choice of law or conflicts of law."  Multi-

Fight Agreement § 16.  Pennsylvania courts have adopted Section 187 of the Restatement

(Second) of Conflict of Laws, which requires enforcement of a choice of law clause:

> unless either (a) the chosen state has no substantial relationship to the parties
> or the transaction and there is no other reasonable basis for the parties'
> choice, or (b) application of the law of the chosen state would be contrary
> to a fundamental policy of a state which has a materially greater interest
> than the chosen state in the determination of the particular issue and which
> . . . would be the state of the applicable law in the absence of an effective
> choice of law by the parties.

Bookard, 443 F. Supp. 3d at 569-70 (citing Kruzits, 40 F.3d at 35).  Neither the first nor the

second exception are implicated here.[8]  Therefore, this Court will enforce the Multi-Fight

Agreement's choice of law clause and apply the substantive contract law of the State of New

York.  New York's principles of contract interpretation are as follows:

> It is axiomatic under New York law . . . that "[t]he fundamental objective
> of contract interpretation is to give effect to the expressed intentions of the
> parties."  In a dispute over the meaning of a contract, the threshold question
> is whether the contract is ambiguous.  "'Ambiguity is determined by
> looking within the four corners of the document, not to outside
> sources.'"  When an agreement is unambiguous on its face, it must be
> enforced according to the plain meaning of its terms.  Whether a contract is
> ambiguous is a question of law, which we review de novo.
>
> It is well settled that a contract is unambiguous if the language it uses has a
> definite and precise meaning, as to which there is no reasonable basis for a
> difference of opinion.  Conversely, . . . the language of a contract is
> ambiguous if it is capable of more than one meaning when viewed
> objectively by a reasonably intelligent person who has examined the context
> of the entire integrated agreement.
>
> When determining whether a contract is ambiguous, it is important for the
> court to read the integrated agreement "as a whole."  If the document as a
> whole "makes clear the parties' over-all intention, courts examining isolated
> provisions should then choose that construction which will carry out the
> plain purpose and object of the [agreement]."

---

[8]   Even if an exception applied, it would be inconsequential because both Pennsylvania and
New York aim to ascertain the intent of the parties by interpreting the contract as a whole.

Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011) (internal citations omitted) (brackets in original).

The Multi-Fight Agreement was a promotional agreement between Top Rank and Frampton, which provided that Queensberry Promotions Limited ("QP")[9] and Frampton "ha[d] the exclusive rights to promote and provide the participation of . . . FRAMPTON . . . in professional boxing matches from the date hereof through the conclusion of the Term (as defined herein) and the exclusive rights to exploit the worldwide television and other Ancillary Rights to such bouts."  Multi-Fight Agreement at 1, Recitals § A.  Thus, QP and Frampton had the right to decide who and when Frampton would fight, to promote those fights, and to profit off of those fights.  By entering into the Multi-Fight Agreement, however, Top Rank, QP and Frampton created "an exclusive agreement pursuant to which [Top Rank] shall promote and distribute bouts for FRAMPTON, including the exclusive distribution rights in the United States and Canada with its licensee, ESPN, Inc."  Id. at 1, Recitals § B.  Therefore, QP and Frampton granted Top Rank the exclusive right to promote and market Frampton as a boxer and to telecast Frampton's fights in North America via ESPN.[10]

Frampton granted Top Rank exclusive promotion and distribution rights for a "period of fifteen months" that "commence[d] on the date of the first bout following the execution of [the] Agreement."[11]  Id. at 3, § 2(a).  In the absence of a specific date, the date of "the first bout" was

---

[9]   Frampton explained at his deposition that QP was his "former promoter, and they [had] a deal with Top Rank to co-promote fights."  Def.'s Br., Ex. B at 48: 2-7.

[10]   The specific rights that Frampton granted to Top Rank are identified in Section 1, titled "Grant of Rights."  See Multi-Fight Agreement at 1-3, § 1.

[11]   The Multi-Fight Agreement was executed on March 7, 2019.  Multi-Fight Agreement at 1, ¶ 1.

expressly conditioned on Frampton's participation.[12]  During this 15-month period, the Multi-

Fight Agreement also provided that "[Top Rank] shall offer FRAMPTON the right to participate

in a minimum of three (3) bouts."  Id.  The plain meaning of this language required Top Rank to

present Frampton with the opportunity to fight in three professional boxing contests.  The

opportunity to fight in three bouts, however, was not guaranteed.[13]  Instead, Frampton was

obligated to exercise this right on his own, as evidenced by the language of Recital A, which

states that QP and Frampton had "the exclusive rights to . . . provide the participation of . . .

FRAMPTON . . . in professional boxing matches."  Id. at 1, Recitals § A.  This exclusive right

was recognized again in Section 5, which vested Frampton with the power to approve each

opponent proposed by Top Rank.  Id. at 4, § 5 ("With respect to all bouts promoted by [Top

Rank] . . . FRAMPTON shall notify [Top Rank] of FRAMPTON's approval or disapproval of

each proposed opponent . . .").

     To the extent that Frampton exercised his participation rights, he would be compensated

in accordance with the language of Section 3 of the Multi-Fight Agreement, which states, in

relevant part:

> 3.  <u>Compensation</u>.  In full and complete compensation and
> consideration for the rights granted herein, [Top Rank] shall pay fees to
> FRAMPTON (or any entity directed by FRAMPTON) as follows:

---

[12]  The Multi-Fight Agreement, when read as a whole, explicitly contemplated Frampton's participation in professional boxing contests as part of the agreement.  For example, Section 1(a) provided that "[QP] and FRAMPTON hereby grant to [Top Rank] the exclusive right to promote *those professional boxing contests to be engaged in by FRAMPTON* from the date hereof through the conclusion of the Term of this Agreement."  Id. at 1, § 1(a) (emphasis added).

[13]  Frampton argues that the language of Section 2(a) entitled him to $1,000,000.00 per bout for three bouts during a 15-month period.  Pl.'s Br. at 5-7.  This contention is flawed, particularly because Section 2(a) contains no language pertaining to compensation.  Instead, the terms of Frampton's compensation are addressed in Section 3 of the agreement.  See Multi-Fight Agreement at 3-4, § 3.

(a)      For the first bout hereunder, [Top Rank] shall pay One Million Dollars ($1,000,000.00) inclusive of the purse paid to FRAMPTON, the amount of which FRAMPTON shall notify to [Top Rank] no later than fourteen (14) days prior to the date of the bout).

(b)      For a championship challenge bout, [Top Rank] shall pay One Million Five Hundred Thousand Dollars ($1,500,000.00) (inclusive of the purse paid to FRAMPTON, the amount of which FRAMPTON shall notify to [Top Rank] no later than fourteen (14) days prior to the date of the bout).

(c)      For a championship defense bout, [Top Rank] shall pay One Million Seven Hundred and Fifty Thousand Dollars ($1,750,000.00) (inclusive of the purse paid to FRAMPTON, the amount of which FRAMPTON shall notify to [Top Rank] no later than fourteen (14) days prior to the date of the bout).

(d)      For a championship unification bout, [Top Rank] shall pay Two Million ($2,000,000.00) (inclusive of the purse paid to FRAMPTON, the amount of which FRAMPTON shall notify to [Top Rank] no later than fourteen (14) days prior to the date of the bout).

Id. at 3-4, §§ 3(a)-(d).  This language identifies four categories of bouts for which Frampton could be compensated: the first bout, a championship challenge bout, a championship defense bout, and a championship unification bout.  By identifying these four categories, the Multi-Fight Agreement expressly limited the kinds of bouts for which Frampton would be compensated.[14] Section 3(a) entitles Frampton to $1,000,000.00 inclusive of the purse paid to him for the first bout.  Id. at 3, § 3(a).  Thus, Section 3(a) only entitled Frampton to a single payment of $1,000,000.00 in exchange for his participation in a single first bout.  After fighting in the first bout, and assuming Frampton exercised his right to fight in a second and third bout, Frampton's compensation was then limited to three types of championship bouts.  Id. at 3-4, §§ 3(b)-(d).  If

---

[14]    This language does not, as Frampton contends, entitle him to $1,000,000.00 per bout for three bouts.  Indeed, if Top Rank intended to compensate Frampton $1,000,000.00 for "the second bout" and $1,000,000.00 for "the third bout" the Multi-Fight Agreement would have certainly contained language reflecting this intent.

subsequent bouts were non-titled bouts, however, Top Rank was required only to provide Frampton "with travel, hotel, and per diems for seven (7) people (two of the seven shall be business class) for a seven (7) day period before and including the date of each bout." See id. at 4, § 3(g) (specifying that Top Rank was required to cover these expenses "for each bout set forth in Section 1(a)"); see also id. at 1, § 1(a) (providing that "the terms of this Agreement shall apply to *championship title bouts as well as non-title bouts*") (emphasis added).

Here, under New York law, the unambiguous language of the Multi-Fight Agreement precludes Frampton's recovery of $1,000,000.00 for the cancelled August 10, 2019 non-title bout. The first bout under Section 2(a) of the Multi-Fight Agreement took place on November 30, 2019 because that was the first fight that Frampton participated in following the agreement's March 7, 2019 execution.[15]  In exchange for his participation in the November 30, 2019 bout, Section 3(a) entitled Frampton to a single payment of $1,000,000.00. Frampton admittedly received this payment, as evidenced by his deposition testimony wherein he testified that he "did receive payment for the November 30th, 2019 fight." Def.'s Br., Ex. B at 49:11-12. Having

---

[15]    To the extent that Frampton claims that he and Top Rank intended the August 10, 2019 bout to be "the first bout" under the Multi-Fight Agreement, this contention is based on evidence that is insufficient to withstand summary judgment. Frampton relies on the affidavit of Carl Moretti, the Vice President of Boxing Operations for Top Rank (the "Moretti Affidavit"), which states: "Carl Frampton was scheduled to fight Emmanuel Dominguez on August 10, 2019 in Philadelphia, Pennsylvania. The fight against Mr. Dominguez was to be Mr. Frampton's first fight under his multi-fight promotional agreement with Top Rank. The fight was canceled after Mr. Frampton suffered an injury." Pl.'s Br., Ex. G at 40, ¶ 2. "As a general proposition, 'conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'" Gonzalez v. Sec'y of the Dep't of Homeland Sec., 678 F.3d 254, 263 (3d Cir. 2012) (quoting Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009)). Consequently, the Moretti Affidavit alone cannot establish conclusively that the cancelled August 10, 2019 bout was "the first bout," particularly where, as discussed supra, the date of the first bout was undoubtedly conditioned on Frampton's participation and Frampton admitted at his deposition that "the November fight was – that was seen as my first fight on the contract with Top Rank." Pl.'s Br., Ex. A at 29: 21-23.

received compensation for the first bout, Frampton is not entitled to a duplicative payment of $1,000,000.00 for the cancelled August 10, 2019 bout.

### B.    The Sponsorship Agreements

#### 1.    The Everlast Agreement

Interstate argues that it is entitled to partial summary judgment because Frampton has been fully compensated under the terms of the Everlast Agreement. Def.'s Br. at 6-7, 13. Frampton, however, contends that had he participated in the August 10, 2019 bout, he would have been entitled to additional compensation under the Everlast Agreement's win bonus clause in Point 4.[16]  Pl.'s Br. at 2-4, 7-9. Viewing the evidence in a light most favorable to Frampton, this Court finds that the Everlast Agreement was unambiguous, and that Frampton did not suffer any lost compensation related to the August 10, 2019 non-title bout.

As an initial matter, English law governs the Everlast Agreement.[17]  Under English law, "[t]he whole instrument, as it stands, must be construed so as to give effect to the intention of the

---

[16]    In addition to the win bonus clause, Point 4 of the Everlast Agreement's Term Sheet provided for several other forms of compensation, namely: (1) a yearly retainer of GBP £20,000 payable monthly in arrears; (2) reimbursement for pre-approved expenses incurred in connection with Frampton's in-person appearances; (3) product supply, the type and frequency of which was at Everlast's sole discretion and was not to exceed the retail value of GBP £4,000 per year; and (4) customized products, the type and frequency of which was at Everlast's sole discretion and was not to exceed the retail value of GBP £200 per fight. Everlast Agreement at 11, Term Sheet, Point 4; see also id. at 14, 16, Terms & Conditions, Cls. 1.1, 4.1, 5. These provisions limit Frampton's right to lost endorsements under the Everlast Agreement to the win bonus clause in Point 4. See Pl.'s Resp. at 2-3, 6-7; Pl.'s Br. at 2-4, 7-9. Because Frampton does not contend that he is entitled to lost endorsements under any other provision of the Everlast Agreement, this Court's analysis is limited to the win bonus clause. Moreover, to the extent that this Court deems other provisions of the Everlast Agreement to be relevant, they will be referenced accordingly.

[17]    The Everlast Agreement contains a choice of law clause, which states: "This Agreement, and any dispute or claim arising out of or in connection with it or its subject matter or formation

(Footnote continued on next page)

parties." McMahon, 236 B.R. at 305 (quoting Russell, 1 ALL ER at 503). In ascertaining the

parties' intent, "the words of a contract are interpreted in accordance with their plain and

ordinary meaning." Crown Cork & Seal Tech. Corp. v. Continental Pet Tech. Inc., 232 F. Supp.

2d 294, 298 (D. Del. 2002) (citing Investors Compensation Scheme Ltd. v. West Bromwich

Bldg. Soc'y, [1998] 1 W.L.R. 896, 913). Further, according to the leading English treatise on

contracts:

> The court's task is to ascertain the objective meaning of the language which
> the parties have chosen in which to express their agreement. The court must
> consider the language used and ascertain what a reasonable person, that is a
> person who has all the background knowledge which would reasonably
> have been available to the parties in the situation in which they were at the
> time of the contract, would have understood the parties to have meant. The
> court must consider the contract as a whole and, depending on the nature,
> formality and quality of drafting of the contract, give more or less weight to
> elements of the wider context in reaching its view as to the objective
> meaning of the language used. If there are two possible constructions, the
> court is entitled to prefer the construction which is consistent with business
> common sense and to reject the other. Interpretation is a unitary exercise;
> in striking a balance between the indications given by the language and the
> implications of the competing constructions, the court must consider the
> quality of drafting of the clause and it must also be alive to the possibility
> that one side may have agreed to something which with hindsight did not
> serve his [or her] interest; similarly, the court must not lose sight of the
> possibility that a provision may be a negotiated compromise or that the
> negotiators were not able to agree [on] more precise terms. This unitary
> exercise involves an iterative process by which each suggested
> interpretation is checked against the provisions of the contract and its

---

(including non-contractual disputes or claims), shall be governed by, and construed in
accordance with English law." Everlast Agreement at 21, Terms & Conditions, Cl. 15.8.
Applying Pennsylvania's choice of law rules, discussed supra in Section III(A), this Court
concludes that Frampton had a substantial relationship to England, namely his and his
representative's addresses were in London, Everlast Agreement at 1, Term Sheet, Point 1, and
that the parties to the agreement intended English law to apply with regard to any disputes under
the agreement. Compare In re McMahon, 236 B.R. 295, 305 (S.D.N.Y 1999) ("[t]he whole
instrument, as it stands, must be construed so as to give effect to the intention of the parties
discovered from the actual terms agreed by the parties and employed by them in the written
instrument as expressing what they intend to agree" (quoting Eastern Counties Building Society
v. Russell, [1947] 1 ALL ER 500, 503)), and In re Mather's Estate, 189 A.2d 586, 589 (Pa.
1963).

> commercial consequences are investigated.  It does not matter whether the
> more detailed analysis commences with the factual background and the
> implications of rival constructions or a close examination of the relevant
> language in the contract, so long as the court balances the indications given
> by each.

I Chitty on Contracts, ¶ 13-047 (33rd ed. 2018) (quoting <u>Lukoil Asia Pac. v. Ocean Tankers</u>,

[2018] EWHC 163 (Comm), [2018] 1 Lloyd's Rep. 654 at [8] (Popplewell, J.)).

Pursuant to the term clause of Point 3 of the Term Sheet, Everlast agreed to sponsor

Frampton for a period of "2 [y]ears or 4 fights (whichever is longer) from Everlast signature."[18]

Everlast Agreement at 11, Term Sheet, Point 3.  Point 4 of the Term Sheet contained the terms of

Frampton's compensation, including the win bonus clause that is at issue.  <u>Id.</u> at 11, Term Sheet,

Point 4.  According to the win bonus clause, Everlast agreed to pay Frampton a bonus of "GBP

£2,500 per win."  <u>Id.</u>

Here, under English law, the language of the term clause and win bonus clause is

unambiguous and, taken together, these clauses preclude Frampton's recovery of the GBP

£2,500 win bonus for the cancelled August 10, 2019 bout.  The term clause of Point 3 guaranteed

that Frampton would participate in four fights during the term of the agreement.  For each of

these four fights, Frampton was eligible for a GBP £2,500 bonus that was expressly conditioned

upon him winning each fight, as evidenced by the language "per win."  <u>Id.</u> at 11, Term Sheet,

Point 4.  At his deposition, Frampton admitted that he satisfied the four-fight requirement and

that he received full compensation for each fight:

> Q.      So if you signed the contract in 2018, to the best of your knowledge,
> have you satisfied the term of four bouts for the Everlast contract?
>
> A.      Yeah.  Pretty much, yeah.

---

[18]   "**Year** means each 12[-]month period from the date of execution of this Agreement by
Everlast."  Everlast Agreement at 15, Terms & Conditions, Cl. 1.1 (emphasis in original).

. . . .

Q.      Okay.   So to the best of your knowledge, you have been paid by Everlast --

A.      Yes.

Q.      -- for the four fights that you have fought, or for four of the five fights that you fought after January 2017?

A.      Yes.  Each fight I have been paid, yes.

Def.'s Br., Ex. B at 36:12-37:12.  Thus, Frampton is not entitled to a win bonus for the August 10, 2019 fight that he did not participate in and win.  Because both Frampton and Everlast fully satisfied their obligations under the agreement, Frampton's claim for an additional GBP £2,500 for the cancelled August 10, 2019 is unavailing.

## 2.      **The Kindred Agreement**

Interstate maintains that Frampton suffered no economic loss under the Kindred Agreement and that, he was fully compensated for his participation in certain promotional activities.  Def.'s Br. at 8-9, 12-13.  Frampton challenges Interstate's interpretation of the Kindred Agreement, arguing that he is entitled to lost endorsements for the cancelled August 10, 2019 bout pursuant to Article 4, Section 2 under which his "compensation schedule is directly calculated by his participation in a number of fights, whereby actual fight participation impacts the timeline of the pay schedule."[19]  Pl.'s Br. at 7.  The unambiguous language of the Kindred

---

[19]    In addition to his base compensation, Article 4, Section 3 of the Kindred Agreement provides for certain performance-related fees that Frampton was entitled to in the event that he won a recognized World Title or participated in a high-profile domestic fight.  See Kindred Agreement at 5, Art. 4, §3; see also id. at 1, Definitions (defining "Performance-Related Fee").  Frampton alleges that he is entitled to lost endorsements under Article 4, Section 2 of the Kindred Agreement.  See Pl.'s Resp. at 2-3, 6-8; Pl.'s Br. at 2-4, 7-8.  Because Frampton does not contend that he is entitled to lost endorsements under any other provision of the Kindred Agreement, this Court's analysis is limited to the specific provisions at issue.  To the extent that other provisions of the Kindred Agreement are necessary to this Court's analysis, they will be referenced accordingly.

Agreement supports Interstate's contention that Frampton suffered no economic loss in connection with the cancelled August 10, 2019 bout.

The substantive contract law of Malta governs the Kindred Agreement.[20]  Malta's principles of contract interpretation are as follows:

### § III. OF THE INTERPRETATION OF CONTRACTS

**1002.** Where, by giving to the words of an agreement the meaning attached to them by usage at the time of the agreement, the terms of such agreement are clear, there shall be no room for interpretation.

**1003.** Where the literal meaning differs from the common intention of the parties as clearly evidenced by the whole of the agreement, preference shall be given to the intention of the parties.

**1004.** When a clause is susceptible of two meanings, it must be construed in the meaning in which it can have some effect rather than in that in which it can produce none.

**1005.** Words susceptible of two meanings shall be taken in the meaning which is more consistent with the subject-matter of the contract.

**1006.** Whatever is ambiguous shall be interpreted according to the usage of the place where the contract is made.

**1007.** Customary clauses shall be deemed to be included in a contract, even though they are not expressed.

**1008.** All the clauses of a contract shall be interpreted with reference to one another, giving to each clause the meaning resulting from the whole instrument.

**1009.** In case of doubt, the agreement shall be interpreted against the obligee and in favour of the obligor.

---

[20]    The Kindred Agreement contains a choice of law clause, which states that "[t]he Agreement is subject to the laws of Malta."  Kindred Agreement at 10, Art. 15, § 1.  Applying Pennsylvania's choice of law rules, discussed supra in Section III(A), this Court concludes that the Kindred Group has a substantial relationship to Malta because that is where it is headquartered.

> **1010.** However general may be the terms in which a contract is worded, it shall only extend to the things which the parties appear to have intended to deal with.

Malta Civ. Code, ch. 16, Book Second of Things, pt. II, title IV, sub-title I, § III, arts. 1002-10, https://legislation.mt/eli/cap/16/eng/pdf.

The Kindred Agreement became effective on the date it was signed on October 30, 2018 by both parties, Kindred Agreement at 11, and it "remained[ed] in force until the completion of the 5th qualifying fight of the Agreement,"[21] Id. at 2, Art. 2, § 1.  In exchange for his contribution,[22] Frampton was to be compensated in accordance with the terms of Article 4, which states, in relevant part:

> 4.1   As compensation for the Contribution, 32Red shall pay the Ambassador an amount of One hundred thousand pounds (£100,000), excluding VAT, for the whole Term of this Agreement. The compensation will be divided into ten instalments of ten thousand pounds (£10,000) payable on 1st October 2018, 1st December 2018, 1st February 2019, 1st April 2019, 1st June 2019, 1st [] August 2019, 1st October 2019, 1st December 2019, 1st February 2020 and 1st April 2020.
>
> 4.2   For every Non-UK fight[23] counting towards the 5 qualifying fights, £10,000 will be taken from the next scheduled payment.  For example, if a fight taking place in U.S.A. is officially announced on January 1st 2019, the following payment schedule would apply:

| Date | Sponsorship Fee |
|---|---|
| 01/10/2018 | £10,000 |
| 01/12/2018 | £10,000 |
| 01/02/2019 | £0 |

---

[21]   "**'Qualifying Fight'** means a UK based, televised, main event or co-main event fight." Kindred Agreement at 1, Definitions (emphasis in original).

[22]   Frampton's contribution under the Kindred Agreement was set forth in Article 3, titled "Contribution of the Ambassador."  Kindred Agreement at 3-4, Art. 3.

[23]   "**'Non-UK Fight'** means a non-UK based, televised, main event or co-main event fight." Kindred Agreement at 1, Definitions (emphasis in original).

|            |         |
|------------|---------|
| 01/04/2019 | £10,000 |
| 01/06/2019 | £10,000 |
| 01/08/2019 | £10,000 |
| 01/10/2019 | £10,000 |
| 01/12/2019 | £10,000 |
| 01/02/2020 | £10,000 |
| 01/04/2020 | £10,000 |
| **TOTAL**  | **£90,000** |

Id. at 5, Art. 4, §§ 1-2.  Under Malta law, the language of the Kindred Agreement is

unambiguous.  It precludes Frampton's recovery of economic damages for the cancelled August

10, 2019 bout.  According to Article 2, Section 1, the Kindred Agreement remained in effect

from the date it was signed by both parties on October 30, 2018 until the completion of

Frampton's fifth "UK based, televised, main event or co-main event fight."  See Id. at 1,

Definitions; see also id. at 2, Art. 2, § 1; id. at 11.  During this term, Article 4, Section 1 required

32Red to pay Frampton a base compensation of £100,000.  Id. at 5, Art. 4, § 1.  His receipt of

this sum was not conditioned on his participation in boxing bouts; instead, it was a function of

time as evidenced by the installment payment schedule.  Id.  The sole limitation on the £100,000

compensation was that, to the extent that Frampton engaged in a "non-UK based, televised, main

event or co-main event fight" that counted as one of the five qualifying fights, £10,000 would be

deducted from his base compensation of £100,000.  Id. at 5, Art. 4, § 2.  This limitation does not,

as Frampton contends, give rise to additional compensation for the August 10, 2019 bout; if

anything, it would have reduced Frampton's base compensation.[24]  Thus, as the foregoing makes

---

[24]    If Frampton had participated in the August 10, 2019 bout and that bout was a "[n]on-UK
fight counting towards the 5 qualifying fights," then £10,000 would have been deducted from the
next scheduled payment after the fight was announced.  Kindred Agreement at 5, Art. 4, § 2.  On
the other hand, if Frampton had participated in the August 10, 2019 bout and that bout was not a
"[n]on-UK fight counting towards the 5 qualifying fights," then his compensation would have
remained unchanged.  Id. at 5, Art. 4, §§ 1-2.

clear, the unambiguous language of the Kindred Agreement precludes Frampton's recovery of lost endorsements for the cancelled August 10, 2019 bout.

### 3.    The 11 Degrees Agreement

Interstate acknowledges that under the language of the 11 Degrees Agreement, 11 Degrees agreed to compensate Frampton in exchange for his public appearances.  Def.'s Br. at 9-10, 12-13.  However, because Frampton admittedly received full payment under the terms of the 11 Degrees Agreement, Interstate argues that he suffered no economic loss following the cancellation of his August 10, 2019 bout.  Id.  In contrast, Frampton argues that, had he participated in the August 10, 2019 bout, he would been entitled to additional compensation as evidenced by the agreement's bonus structure clause in Section 4.1.[25]  Pl.'s Br. at 3-4, 7-9.  Viewing the evidence in a light most favorable to Frampton, this Court finds that the 11 Degrees Agreement is unambiguous, and that Frampton did not suffer any lost compensation related to the cancelled August 10, 2019 non-title bout.

The 11 Degrees Agreement contains no choice of law clause and consequently, Pennsylvania contract law governs the agreement.  Under Pennsylvania law, the goal of contract interpretation is to "ascertain and give effect to the intention of the parties."  Lower Frederick Twp. v. Clemmer, 543 A.2d 502, 510 (Pa. 1988); see also 401 4th St., Inc. v. Investors Ins. Group, 879 A.2d 166, 171 (Pa. 2005).  "The whole instrument must be taken together in arriving

---

[25]    In addition to the compensation set forth in Section 4.1, the 11 Degrees Agreement also entitled Frampton to royalties on revenue and sales on all products associated with Frampton. See 11 Degrees Agreement at 40, §§ 4.5-4.6.  In his Response to Interstate's Motion for Partial Summary Judgment, however, Frampton limits his right to lost endorsements under the 11 Degrees Agreement to the bonus structure clause in Section 4.1.  See Pl.'s Resp. at 2-3, 6, 8-9; Pl.'s Br. at 2-4, 7-9.  Because Frampton does not argue that he is entitled to lost endorsements under any other provision of the 11 Degrees Agreement, this Court's analysis is limited to the specific provision at issue.  To the extent other provisions of the 11 Degrees Agreement are necessary to this Court's analysis, they will be referenced accordingly.

at contractual intent." Murphy v. Duquesne Univ. of the Holy Ghost., 777 A.2d 418, 429 (Pa. 2001).  When interpreting a contract, "[i]t is for the court, as a matter of law, to determine whether ambiguity exists."  Kiewit E. Co. v. L & R Const. Co., 44 F.3d 1194, 1199 (3d Cir. 1995) (quoting Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986)).

"A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." Trizechahn Gateway LLC v. Titus, 976 A.2d 474, 483 (Pa. 2009) (quoting Ins. Adjustment Burear v. Allstate, 905 A.2d 462, 468-69 (Pa. 2006)).  In determining whether an ambiguity exists, "[c]ourts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed."  Murphy, 777 A.2d at 429 (citing Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982)).  Moreover, courts must not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity."  Trizechahn, 976 A.2d at 483 (quoting Murphy, 777 A.2d at 430).  Indeed, "there is no ambiguity if one of the two proffered meanings is unreasonable."  Id. (citing Murphy, 777 A.2d at 430).

Where the court determines that "a written contract is clear and unequivocal, its meaning must be determined by its contents alone.  It speaks for itself and a meaning cannot be given to it other than that expressed."  Kiewit, 44 F.3d at 1199 (quoting Steuart, 444 A.2d at 661).  Under such circumstances, the "interpretation and construction [of the unambiguous contract] are for the court, not the jury [to determine]."  Hewes v. McWilliams, 194 A.2d 339, 342 (Pa. 1963); see also Trizechahn, 976 A.2d at 483 ("[U]nambiguous contracts are interpreted by the court as a matter of law . . ." (citing Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004))).  Where, however, the court determines that a contract is ambiguous, the "ambiguous writing[] [is then] interpreted

by the finder of fact."  Kripp, 849 A.2d at 1163 (citing Community College v. Society of the

Faculty, 375 A.2d 1267, 1275 (Pa. 1977)).

The term of the 11 Degrees Agreement was from "the date of signature" until "three (3)

fights or twelve (12) months whichever is greater."  11 Degrees Agreement at 38, § 1.  During

this term, 11 Degrees agreed to compensate Frampton in accordance with the language of

Section 4, which provides, in relevant part:

> 4.1    In consideration of the provision of the Services[26] and Rights[27]
> granted to 11 Degrees under this Agreement by the Ambassador, in
> accordance with the provisions of this Agreement, 11 Degrees will pay the
> Ambassador the following (plus VAT).
>
> 4.1.1   £10,000 on signature
> 4.1.2   £15,000 on 1st December 2018
> 4.1.3   £15,000 on 1st February 2019
> 4.1.4   £5,000 on 1st June 2019
>
> Bonus structure – based on winning each fight
>
> 4.1.5   £1,666 on 18th August
> 4.1.6   £1,666 on date of Fight 2
> 4.1.7   £1,666 on date of Fight 3

Id. at 39, § 4.1.

Under Pennsylvania law, the language of the 11 Degrees Agreement is unambiguous,

and, as applied here, it precludes Frampton's recovery of the bonuses set forth in Sections 4.1.5

---

[26]   Section 2 contains the services Frampton agreed to provide in exchange for 11 Degrees
agreeing to compensate Frampton, specifically certain types of public appearances.  11 Degrees
Agreement at 38, § 2.1.

[27]   Section 3 contains the rights granted to 11 Degrees.  11 Degrees Agreement at 38, § 3.1.

through 4.1.7 for the cancelled August 10, 2019 bout.[28]  Section 1 guaranteed that Frampton

would participate in three fights during the term of the 11 Degrees Agreement.  See id. at 38, § 1

("This Agreement . . . shall remain in full force for three (3) fights or twelve (12) months

whichever is greater.").  For each of these fights—and only these three fights as evidenced by the

language "on 18th August," "on date of Fight 2," and "on date of Fight 3," see id. at 39, §§ 4.1.5-

4.1.7—Frampton was eligible for a bonus of £1,666, and, his receipt of this bonus was expressly

conditioned on winning each bout, see id. at 39, § 4.1 ("Bonus structure – *based on winning each*

*fight*.") (emphasis added).  At his deposition, Frampton admitted that he satisfied the three-fight

requirement and that he was compensated accordingly:

> Q.     So assuming the commencement date was on – was the later of the
> two dates of the signatures, July 31st, 2018, have you participated in three
> fights since that time, since July of 2018?
>
> A.     Yeah, I think so, yeah.
>
> Q.     Okay.  So once again you were paid in full under this contract?
>
> A.     Yeah.

Def.'s Br., Ex. B, at 45:12-20.  Consequently, the terms of Sections 4.1.5 through 4.1.7 have

been satisfied and Frampton is not entitled to any additional compensation for the cancelled

August 10, 2019 bout.

As the above analysis demonstrates, Frampton's demand for lost endorsements under the

11 Degrees Agreement lacks merit.

---

[28]     Frampton is also not entitled to the payments identified in Sections 4.1.1 through 4.1.4
because the amount and dates of these payments remained the same regardless of when
Frampton participated in a bout or how often he participated in a bout.  See 11 Degrees
Agreement at 39, §§ 4.1.1-4.1.4.  Given that the last payment was scheduled for June 1, 2019,
which was more than two months before the August 10, 2019 bout, Frampton would have
already been fully compensated under these provisions when the August bout was cancelled.

IV.    **CONCLUSION**

For the foregoing reasons, this Court finds that no genuine issues of material fact exist regarding whether Frampton is entitled to approximately $1,200,000.00 in economic damages related to his promotion and sponsorship agreements.  Therefore, Interstate's Motion for Partial Summary Judgment will be granted.  An appropriate Order follows.

Dated: March 22, 2021

BY THE COURT:


*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE